IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MOHAMMED SHINWARI,

        Plaintiff,

vs.

        Case No. 05-1167-JTM

UNIVERSITY OF PHOENIX,

        Defendant.

MEMORANDUM AND ORDER

This matter comes before the court on defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. The court held an oral hearing after the motion was fully briefed and ripe for determination. For the reasons set forth below, the court grants defendant's motion.

*I. Factual Background*

The University of Phoenix (the "University") provides an array of degrees and programs in three formats: on-ground (traditional face-to-face classroom courses), FlexNet (combination of on-ground and on-line courses), and on-line (exclusively web-based, interactive courses). Hines-Star, Ph.D. Declaration, at ¶ 3. In 2002, the University began to establish the Wichita, Kansas campus, by soliciting prospective part-time faculty members. Tausz Declaration, at ¶ 4.

The University requires its faculty candidates to complete a three-phase training process which is outlined as follows: (1) New Faculty Assessment; (2) New Faculty Orientation and Pre-Service Training; and (3) Mentor and Coaching Program. Star Declaration, at ¶ 7-9; Tausz Declaration at ¶ 3.

During the first phase of the training process, the Faculty Assessment stage, the University interviews prospective candidates to evaluate their knowledge and potential for success. Star Declaration at ¶ 7. For faculty candidates applying to teach on-ground or FlexNet classes, the University requires them to give a short presentation to a small group of administrators in a simulated classroom environment to determine their presentation and communication skills. *Id.* If the candidate successfully completes the first phase, the University invites the candidate to attend the second phase of the training, New Faculty Orientation and Pre-Service training. *Id.*, at ¶ 8. During this phase, a candidate submits his or her transcripts and work history. Thereafter, the University evaluates the candidate's academic and professional experiences to determine if the candidate meets the course's approval requirements. *Id.* If the candidate meets a given course's approval requirements, the candidate is advised that all training has been successfully completed. *Id.* Thereafter, the candidate is eligible to teach certain courses as the courses become available in the University's program sequence. *Id.*

For FlexNet candidates, candidates must complete the New Faculty Certification process, which is an extensive five-session course involving both live and web-based training exercises. *Id.* The sessions are simulated to model an actual five-week course at the University with both live and web-based sessions. *Id.* Candidates also receive training on teaching methods at the University, the pertinent University policies and procedures, and applicable laws and regulations, such as the Americans with Disabilities Act (ADA) and the Family Educational Rights and Privacy Act (FERPA). *Id.* Additionally, prospective faculty members must pass various university tests which cover topics such as complying with the ADA and FERPA. *Id.* Candidates also receive a copy of the University Faculty Handbook. *Id.*; Shinwari Deposition, at pp. 145:20-152:13. Upon completing

the second phase of the training, the candidate must then satisfactorily complete the University's FlexNet Making the Transition test. Star Declaration, at ¶ 8.

If the candidate successfully completes the second phase, the candidate may proceed to the Mentorship phase. *Id.*, at ¶ 9. The Mentorship program is designed to help new faculty members become immediately acclimated to the University's teaching and learning model. Additionally, the program gives faculty members an opportunity to share and learn from the experience of colleagues. *Id.* In the Mentorship phase, the candidate is assigned a mentor who begins coaching the candidate regarding preparation of a syllabus for approved courses and provides the candidate the opportunity to observe an actual class. *Id.* During this phase, the University will look to assign the candidate a course to teach under the guidance of the mentor, based upon the pre-approved courses identified in the second phase. *Id.* Once a course becomes available, the University will assign the course to the candidate to teach the course under the guidance of the mentor. *Id.* Upon the successful completion of all phases, the prospective faculty member becomes eligible to be hired on a course-by-course contract basis. *Id.*

In early 2002, plaintiff responded to the University's advertisement for part-time FlexNet faculty positions at the Wichita, Kansas campus. Shinwari Deposition, at pp. 34:12-38:24, 52:17-54:7. Dr. Merlyne Hines-Starr, currently Midwest Regional Director of Academic Affairs ("DAA") and previously DAA of the Kansas/Missouri campus, invited plaintiff and other individuals to attend the Faculty Assessment. *Id.*, at pp. 35:9-37:14. Plaintiff successfully progressed through the Faculty Assessment and Dr. Hines-Starr invited plaintiff to attend formal training. *Id.*, at pp. 35:9-37:11. During phase two of the University's training process, plaintiff received documents relating to the University's policies and procedures. *Id.*, at pp. 38-25-40:14. Plaintiff also received a copy of the

University Handbook. *Id.*, at pp. 125:11-25. Plaintiff completed the FlexNet Making the Transition and progressed to the third phase of training. *Id.*, at pp. 42:4-43:3. In accordance with the assessment and development procedures, the University determined that plaintiff's credentials were suitable to teach Math 208 and 209. *Id.*, at pp. 43:4-6, 45:20-46:24. Dr. Hines-Starr determined that plaintiff had successfully completed the Orientation and Pre-Service Training and could proceed to the next phase of formal faculty training. *Id.*

Plaintiff was assigned to teach a five-week session of Math 208 in the Fall of 2003 under the mentorship of Steve Raider. *Id.*, at pp. 43:21-45:23. Jeff Davis, Campus Chair, requested that plaintiff prepare to teach the course by creating a syllabus and the lecture for the first day of class to be conducted on-ground. *Id.*, at pp. 47:22-48:23. In the interim, as the University was adjusting to the enrollment at the new Wichita, Kansas campus, it became necessary to consolidate two different sequences of Math 208. *Id.*, at pp. 49:6-50:11, 54:8-24. The University determined that because the consolidation had increased the class size to a level beyond what was appropriate for a faculty candidate who had yet to complete training, plaintiff could not teach the course. *Id.* As a result, in late September 2003, Mr. Davis informed plaintiff that the course would be taught by Mr. Raider. *Id.*, at pp. 48:24-49:5.

When plaintiff learned that he would not be teaching the consolidated Math 208 course, he spoke with Dr. Paul Goddard, Director of Academic Affairs in Wichita. *Id.*, at pp. 49:6-50:11, 54:8-24. Dr. Goddard explained to plaintiff that the class size was too large for a new instructor. *Id.* After Dr. Goddard's explanation, plaintiff communicated to Dr. Craig Swenson and Dr. Elizabeth Tice in an e-mail dated September 25, 2003 that he was the victim of discrimination. *Id.*, at pp. 55:18-56:5, 59:7-10. Plaintiff also expressed that the University took the Math 208 class away from

him due to the University's animus against his Pakistani background in the post-September 11, 2001 context. Additionally, plaintiff stated that he did not believe the University employed many people with Pakistani backgrounds. *Id.*, at pp. 58:11-60:16. Dr. Swenson responded by explaining that it is not unusual to cancel or postpone classes or to decrease the number of students in a particular class. *Id.*, at pp. 184:8-187:11.

Thereafter plaintiff met with Dr. Goddard and Dr. Jerrad Tausz at Dr. Goddard's request. Plaintiff informed Dr. Goddard and Dr. Tausz that he felt the University had discriminated against him on the basis of his national origin. *Id.*, at pp. 61:12-63:3.

Although plaintiff did not teach Math 208 in the Fall of 2003, the University, in accordance with its assessment and development procedures, offered plaintiff a second opportunity to teach Math 208 when the sequence became available again. *Id.*, at pp. 63:25-64:15. The course was scheduled to start in February 2004 as a FlexNet course. *Id.*, at pp. 64:16-67:23. Plaintiff taught the first week's live session and began to teach the second week's on-line session of the course. *Id.*, at pp. 68:13-70:19. After plaintiff began the first on-line session, students began to complain to plaintiff via e-mail. *Id.* Mr. Raider, the assigned mentor, became aware of the student complaints through his monitoring of the class sessions. *Id.*, at 74:4-77:11, 92:2-14, 129:17-131:19. Through his monitoring, Mr. Raider discovered that plaintiff disclosed a student's personal academic information. Thereafter, Mr. Raider counseled plaintiff and notified Dr. Hines-Starr. *Id.* When Dr. Hines-Star learned of the concerns arising out of plaintiff's Math 208 class, she approved plaintiff's removal as instructor for the Math 208 course. *Id.*, at pp. 71:17-73:1. Plaintiff was removed on March 4, 2004. *Id.*

After removing plaintiff as an instructor from the Math 208 course, several administrators, including Connie Kramer and Dr. Goddard, met with plaintiff in March 2004 to explain that the reassignment occurred due to student complaints and a potential violation of FERPA when plaintiff disclosed a student's academic information on different occasions. *Id.*, at 74:4-77:11, 92:2-14, 129:17-131:19. As a result of the student complaints, the University requested that plaintiff retake the second phase of the training in order to be considered for another mentor-supervised assignment. *Id.*, at pp. 92:18-94:10; *see also* Tausz Declaration Exhibit A, at p. 58.

On December 27, 2004, plaintiff wrote the Equal Employment Opportunity Commission ("EEOC"). On January 18, 2005, the EEOC contacted plaintiff to request additional information to substantiate his claims. Defendant's Exhibit 6, EEOC letter to plaintiff. The EEOC advised plaintiff that any allegations for the time period prior to early 2004 were untimely; therefore, the EEOC lacked jurisdiction for those allegations. *Id.* On January 25, 2005, plaintiff filed a charge with the EEOC. Defendant's Exhibit 7, Charge. On March 1, 2005, the EEOC issued plaintiff a "No Cause" determination regarding plaintiff's charge of discrimination which stated that "[b]ased on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." Defendant's Exhibit 8, Notice of Rights.

Plaintiff brought the present case alleging discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981.

*II. Summary Judgment Standards*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.,* 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents,* 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. ``In the language of the Rule, the nonmoving party must come forward with `specific facts showing that there is a *genuine issue for trial*.' '' *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita* ). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).

*III.  Conclusions of Law*

Defendant argues summary judgment is appropriate for three reasons.  First, defendant argues that plaintiff's claims of discrimination and retaliation are time-barred.   Second, plaintiff cannot meet the prima facie case for discrimination and retaliation under Title VII, noting that plaintiff's claim that he was discriminated against because of post-September 11, 2001 events is without merit. Finally, defendant states that plaintiff cannot establish his claim for relief under 42 U.S.C. § 1981. For the following reasons, the court grants summary judgment.

*A. Plaintiff's Charge with the EEOC:*

In a deferral state such as Kansas, a Title VII claimant must file his discrimination charge with the appropriate state or local agency, or with the EEOC, within 300 days of the alleged unlawful act. *Hernandez v. Data Systems Intern., Inc.*, 266 F. Supp. 2d 1285, 1295 (D. Kan. 2003) (citing *Peterson v. City of Wichita, Kan.*, 88 F.2d 1307, 1308 (10th Cir. 1989) (citing 42 U.S.C. § 2000e-5(e); *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 108 (1988))).

Plaintiff attempted to file his charge with the EEOC on December 27, 2004. Thereafter, on January 18, 2005, the EEOC contacted plaintiff to request additional information to substantiate plaintiff's claims. In the letter dated January 18, 2005, the EEOC also advised plaintiff that "[t]he information you submitted **has not** been filed as a charge." Defendant's Exhibit 6, Plaintiff's Charge of Discrimination (emphasis in original). Furthermore, the EEOC stated: "Please note that a charge must be filed with the EEOC within 300 days of the date of violation. We received your questionnaire on Dec. 27, 2004, so allegations before March 2, 2004 are untimely." *Id.* On January 25, 2005, plaintiff filed a formal charge with the EEOC noting that he "was given a course which was then taken away." Plaintiff's Exhibit 7, Charge, at pg. 3. Plaintiff noted under "Section F., Retaliation," that he believed he was discriminated against; followed by a complaint on September 25, 2003 to Dr. Swenson. *Id*. Plaintiff stated that he complained "[a]bout not getting any courses to teach." *Id*. Plaintiff believed that the harm he experienced as a result of the complaint was that "[he] was given a course which was then taken away." *Id*. In correspondence dated March 1, 2005, the EEOC stated: "Your allegations in 2003 and early 2004 are beyond the EEOC's 300 day jurisdiction." Defendant's Exhibit 8, Notice of Rights.

Plaintiff filed a charge with the EEOC outside the 300-day limitation period. Therefore, the court grants summary judgment in favor of the defendant as to such claims.

B. *Plaintiff's Title VII Claim:*

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Where a plaintiff lacks direct evidence of discrimination, the plaintiff in a Title VII matter "must abide by the complicated formula first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973), for proving discrimination by indirect evidence." *Forsythe v. Board of Educ. of Unified School Dist. No. 489, Hays, Kan.*, 956 F. Supp. 927, 931 (D. Kan. 1997) (quoting *Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1116 (7th Cir.1993), *cert. denied*, 510 U.S. 1116, (1994); *see Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087 (5th Cir.1994) (referring to the inferential proof process as the three-step McDonnell Douglas-Burdine "minuet.")). The plaintiff in such a case must establish, by a preponderance of the evidence, a "prima facie" case of racial discrimination. *Forsythe*, 956 F. Supp. at 931 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 505-06 (1993)). In the prima facie case, the plaintiff must show that "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination." *Salguero v. City of Clovis,* 366 F.3d 1168, 1175 (10th Cir. 2004).

If plaintiff establishes the prima facie case, the University must then articulate a legitimate, nondiscriminatory reason for the termination that is "not facially prohibited by Title VII." *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992). Although the McDonnell Douglas

9

presumption places the burden of production on the defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Forsythe*, 956 F. Supp. at 932 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Should the defendant fail to provide a legitimate, nondiscriminatory reason for the termination, the plaintiff is entitled to judgment as a matter of law. *St. Mary's*, 509 U.S. at 508-11 (1993). However, "[i]f on the other hand, the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework - with its presumptions and burdens - is no longer relevant." *Id*. at 510. If the defendant has carried its burden of production, in order to prevail, the plaintiff must then provide evidence to demonstrate that the University's action was based upon the plaintiff's race, religion, sex, or national origin rather than upon either a valid nondiscriminatory reason or upon no reason at all. *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1319 (10th Cir. 1992). Here, the parties disagree as to the second and third elements of the plaintiff's prima facie case.

Plaintiff argues that he was capable of teaching the course in a satisfactory manner and did in fact suffer an adverse employment action, demonstrated by the University's action to retrain plaintiff instead of teaching the class and, therefore, earning income.[1] However, defendant notes that plaintiff cannot establish that he was capable of teaching the course in a satisfactory manner. Furthermore, the University argues that plaintiff's opportunity to gain experience through retraining does not constitute an adverse employment action. Despite plaintiff's assertions, the court finds that

---

[1] Plaintiff also asserts that after the terrorist attacks of September 11, 2001, the University not only resisted hiring and employing individuals of Pakistani descent, but also discriminated and retaliated against plaintiff. Plaintiff's assertions of discrimination and retaliation are completely unfounded for the reasons set forth within this opinion.

10

plaintiff cannot establish that he was capable of teaching the course in a satisfactory manner and did not suffer an adverse employment action.

An adverse employment action exists where an action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1988). The Tenth Circuit "liberally defines the phrase 'adverse employment action.'" *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (noting that "it is not simply limited to monetary losses in the form of wages or benefits. Instead we take 'a case-by-case approach' examining the unique factors relevant to the situation at hand." *Id*. (citation omitted)). However, one factor that demonstrates that a given action may be an "adverse employment action" is that the action causes "harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986-87 (10th Cir. 1996)). "[A] mere inconvenience or an alteration of job responsibilities" is not considered to be an adverse employment action. *Sanchez*, 164 F.3d at 532. *See also Couture v. Belle Bonfils Memorial Blood Center*, No. 04-1397, 2005 WL 2746704, at *5 (10th Cir. Oct. 25, 2005) (holding that an adverse employment action did not exist where appellant did not allege "with any specificity the degree to which he would be entitled to such extra pay.").

The University's action in offering to retrain plaintiff does not rise to the level of a "significant change in employment status" because plaintiff fails to specifically allege future harm to employment prospects, including the degree to which plaintiff might be entitled to extra pay. In fact, throughout the retraining, plaintiff continued to receive pay from the University. The court does not find that plaintiff suffered an "adverse employment action" when he was assigned to retraining.

Even if plaintiff could establish the prima facie case for discrimination, the court finds that the University acted legitimately in retraining plaintiff. The University's Handbook states: "Retention by the University of Phoenix is for the current course assignment only and there is no guarantee of any future course assignments." Defendant's Exhibit 1A, University of Phoenix Faculty Handbook, Section 7: Faculty Compensation and Benefits, at pg. 59. Due to the alleged violation of FERPA, the University acted legitimately in reassigning the plaintiff to additional training. *See also* Defendant's Exhibit 1A, University of Phoenix Faculty Handbook, at pg. 41 (noting that additional training may be recommended where the mentor perceives difficulties).

Plaintiff's reassignment took place because he could not teach the course in a satisfactory manner. The University assigned plaintiff a mentor to ensure plaintiff met the University's requirements and standards. When plaintiff allegedly disclosed private student information, the mentor intervened and counseled plaintiff. Thereafter, the University met with plaintiff to offer an explanation as to why the reassignment occurred.

For these reasons, the court finds that plaintiff cannot establish the prima facie case for discrimination.

*C. Plaintiff's Retaliation Claim:*

Defendant also argues that plaintiff cannot establish his claim for retaliation. The parties disagree as to the second prong of the prima facie case for retaliation. To succeed with a retaliation claim, plaintiff must show (1) that he or she engaged in protected activity; (2) that the employer took an adverse employment action against the plaintiff; and (3) that there exists a causal connection between the protected activity and the adverse action. *Aquilino v. University of Kansas,* 268 F.3d 930, 933 (10th Cir. 2001) (quoting *Jeffries v. Kansas,* 147 F.3d 1220, 1231 (10th Cir.1998)). As

noted with plaintiff's Title VII claim, plaintiff did not suffer an adverse employment action. Therefore, he fails to prove the retaliation prima face case.

D. *Plaintiff's § 1981 Claim:*

Plaintiff claims that the University's actions are in violation of 42 U.S.C. § 1981. The elements of a retaliation claim are identical to those required under Title VII. *Maldonado v. City of Altus,* 433 F.3d 1294, 1308 (10th Cir. 2006) (citing *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1103 n. 1 (10th Cir. 1998)). For the reasons set forth in the court's disposition of plaintiff's retaliation claim, the court also finds that the plaintiff cannot sustain the § 1981 claim.

IT IS ACCORDINGLY ORDERED this 23rd day of October, 2006, that defendant's motion for summary judgment (Dkt. No. 39) is granted; defendant's motion to strike portions of plaintiff's statement of facts (Dkt. No. 43) is denied.

s/ J. Thomas Marten  
J. THOMAS MARTEN, JUDGE